The defendant, James W. Pierson, Jr., appeals his convictions of possession with an intent to distribute a class B substance, in violation of G. L. c. 94C, § 32A(a ), and a school zone violation, see G. L. c. 94C, § 32J. On appeal, the defendant maintains that: (1) the evidence was insufficient to show that the offenses charged took place within a school zone; (2) the Commonwealth's witnesses impermissibly testified that the defendant was under "surveillance" and subject to a narcotics-related investigation; (3) the Commonwealth's expert invaded the jury's role by speaking directly to the issue of guilt; (4) the prosecutor engaged in improper vouching during closing argument; and (5) testimony by a substitute chemist violated his confrontation rights. We affirm.
Background. On October 17, 2014, several officers conducted surveillance of the area near a residence in Pittsfield, located on Columbus Avenue. In particular, they were surveilling the defendant. During this time, the officers witnessed the defendant walk outside of the residence and meet with a woman for "several seconds." Five minutes later, the officers again witnessed the defendant come from the area of that same residence and meet another woman for a brief period of time. Shortly thereafter, the officers observed a car pull up outside of the residence and a woman went inside, returning to her car within a few minutes. Roughly thirty minutes later, another man walked into the residence and returned to his car within minutes. About fifteen minutes after that, the defendant got into a car that had pulled up and parked on Columbus Avenue Extension near Onota Street. When the officers stopped the car, they observed a large sandwich bag with what looked like crack cocaine inside. The car's driver was holding "a few [ten dollar bills]." The defendant was arrested and found with $281 in cash and a cellphone.
1. School zone violation. At trial, the defendant moved unsuccessfully for a required finding of not guilty with regard to the school zone violation, maintaining that the roadway leading to the school could not be considered school property under G. L. c. 94C, § 32J. In reviewing the denial of a motion for a required finding of not guilty, "we consider 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " Commonwealth v. Sullivan, 478 Mass. 369, 373 (2017), quoting from Commonwealth v. Latimore, 378 Mass. 671, 677 (1979). The evidence presented at trial, viewed in the light most favorable to the Commonwealth, was sufficient to support the defendant's conviction of a school zone drug violation.
It is not necessary that the school own the property, or that the school's precise boundary be discernable for it to fall within the statute's reach. See Commonwealth v. Klusman, 46 Mass. App. Ct. 919, 920 (1999) ; Commonwealth v. Johnson, 53 Mass. App. Ct. 732, 734-735 (2002). Rather, the Commonwealth need only prove that the point in question could reasonably fall "on land used for school purposes." Id. at 734. See Commonwealth v. Paige, 54 Mass. App. Ct. 840, 843-844 (2002) (contiguous, unused, and undeveloped school land was school property); Commonwealth v. Cintron, 59 Mass. App. Ct. 905, 906 (2003) (curbstone, which was adjacent to school zone sign, fell within statute's proscribed area).
A professional land surveyor testified that the defendant was arrested 261 feet from the center line of a drive that led to St. Mark's School, an operational elementary school at the time of the defendant's arrest. Although there was evidence that the city owned the road, the surveyor testified that it was "obvious[ ]" that the point in question "was the driveway up to the school." The road was the only possible means of access to the school, and it was marked with a sign stating, "St. Mark's School." Finally, there was testimony establishing that nothing other than the school was located along the road, and that buses, parents, and children used the road to travel to and from school. From this evidence, the jury could have permissibly inferred that the road was property used for school purposes.
2. Surveillance and investigation testimony. The trial judge allowed the defendant's pretrial motion in limine to exclude evidence of prior drug transactions in the months before trial.[2] Yet, over the course of the trial, several of the prosecution's witnesses testified over objection that the defendant was under "surveillance" on the day of his arrest.[3] The defendant contends that this testimony was a covert form of improper prior bad acts evidence that was likely to have affected the jury's verdict. Since defense counsel objected to Officer Marley and Trooper Scott's testimony, we review for error, and if there was error, for prejudicial error.[4] See Commonwealth v. Crayton, 470 Mass. 228, 252 (2014).
"Evidence of a defendant's prior or subsequent bad acts is inadmissible for the purpose of demonstrating the defendant's bad character or propensity to commit the crimes charged." Id. at 249. See Mass. G. Evid. § 404(b) (2017). Such evidence, however, may be introduced "for some other purpose, for instance 'to establish motive, opportunity, intent, preparation, plan, knowledge, identity, or pattern of operation.' " Ibid., quoting from Commonwealth v. Walker, 460 Mass. 590, 613 (2011). "[E]ven if relevant, a judge must guard against the risk that evidence of prior bad acts will divert the jury's attention from the charged acts." Commonwealth v. Dwyer, 448 Mass. 122, 129 (2006). Thus, a judge may exclude "bad act" evidence, even if proffered for a permissible purpose, "if its probative value is outweighed by the risk of unfair prejudice to the defendant." Crayton, supra at 249.
The officers' testimony about their observations of the defendant was admissible to show the defendant's intent and motive to sell drugs. See Commonwealth v. Gollman, 436 Mass. 111, 114-115 (2002). Even if we assumed the repeated references to the officer's surveillance of the defendant was error, see Commonwealth v. Rivas, 466 Mass. 184, 194 (2013), given the overwhelming evidence presented against the defendant, we are confident that they "did not influence the jury or had but very slight effect." Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994), quoting from Commonwealth v. Peruzzi, 15 Mass. App. Ct. 437, 445 (1983).[5]
3. Expert testimony. Trooper Hean, a narcotics investigator for the State police detective unit, served as the prosecution's expert witness at trial. In response to a series of hypotheticals, Trooper Hean testified that the defendant's conduct was consistent with a drug transaction. However, in response to one question, the trooper testified that the hypothetical facts, coupled with the amount of drugs found, would lead him to "very strongly believe that that amount of drugs was possessed with the intent to be distributed." The defendant maintains that this statement impermissibly spoke to the issue of guilt. The defendant did not object to this statement at trial. Accordingly, we review for error, and in the presence of error, for a substantial risk of miscarriage of justice. See Commonwealth v. Madera, 76 Mass. App. Ct. 154, 160 (2010).
An expert may properly testify that hypothetical facts are consistent with intent to distribute drugs, because "[w]hether a certain quantity of drugs is consistent with personal use or with distribution is a matter not within the common experience of jurors." Commonwealth v. Wilson, 441 Mass. 390, 401 (2004). See Commonwealth v. Dancy, 75 Mass. App. Ct. 175, 185 (2009). The expert's testimony as to his "belief" constituted a "personal assurance by the witness that the crime charged had occurred, and thereby constitutes an improper intrusion into the fact-finding function of the jury." Commonwealth v. Tanner, 45 Mass. App. Ct. 576, 580 (1998).
As in Tanner, however, we also conclude that it is unlikely that the improper comment was sufficiently "prejudicial to require relief." Ibid. While we have stated that the risk of prejudice is heightened when an expert is also a percipient witness, see ibr.US_Case_Law.Schema.Case_Body:v1">id. at 579, 582, the judge in this case specifically instructed the prosecutor that Trooper Hean was only to be questioned as an expert using hypothetical questions, and not as an observer. This differentiates Trooper Hean's testimony from other expert witness testimony that our case law has found erroneous. Compare Commonwealth v. Woods, 419 Mass. 366, 368, 374-375 (1995) ; Commonwealth v. Burgess, 450 Mass. 422, 435-436 (2008) ; Commonwealth v. Ortiz, 50 Mass. App. Ct. 304, 306-307 (2000). Moreover, no substantial risk of a miscarriage of justice resulted, given that the misstatement was, in essence, explanatory, see Tanner, supra at 581,[6] and given the overall strength of the prosecution's case. See ibr.US_Case_Law.Schema.Case_Body:v1">id. at 580 ; Dancy, supra at 185-186.
4. Closing argument. The defendant contends that the prosecutor, in his closing argument, improperly expressed his opinion as to the officers' credibility, describing the prosecutor's statements that the Commonwealth's witnesses were "very honest" and "perfectly honest." Since the defendant objected at trial, we review to determine whether the statements were improper and, if so, whether the error was prejudicial. See Commonwealth v. Nelson, 468 Mass 1, 10 (2014).
Taken in context, the prosecutor's statements did not constitute improper vouching.[7] See Commonwealth v. Whitman, 453 Mass. 331, 343 (2009) ("Remarks made during closing arguments are considered in the context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury"). The prosecutor did not express his personal belief about the witnesses' credibility, nor did he imply that he had special knowledge with which he could verify the witnesses' testimony. See Commonwealth v. Rosario, 460 Mass. 181, 190 (2011). Instead, by emphasizing weaknesses in the officers' testimony, the prosecutor argued from the evidence that the witnesses should be believed. See Commonwealth v. Rolon, 438 Mass. 808, 816 (2003) ("It is not improper vouching for the prosecutor to point to reasons why a witness's testimony, or portions of a witness's testimony, should logically be believed"). The jury were free to accept or reject this argument. Even if error could be discerned from this portion of the prosecutor's closing, the judge instructed the jury that closing arguments are not evidence and that they were charged with determining witness credibility, thus ameliorating any possibility of prejudice. See Commonwealth v. Koumaris, 440 Mass. 405, 415 (2003).
5. Substitute chemist. Lastly, the defendant contends that his confrontation rights under the Sixth Amendment to the United States Constitution were violated when a substitute chemist was permitted to testify that the substance seized from the defendant contained cocaine. Commonwealth v. Greineder, 464 Mass. 580, 594-599, 603 (2013), forecloses this claim.
Caroline Tatro, a supervisor in the drug unit at the State police crime laboratory (lab), testified that though she did not personally test the substance seized from the defendant, after reviewing the case file, she could opine that the powder provided to the lab contained cocaine. Tatro did not testify as to the data contained in the reports; rather she gave only her independent opinion after reviewing the results of the testing. Moreover, she was available for cross-examination. Under Greineder, supra, this testimony was admissible.
Judgments affirmed.

The judge also allowed the Commonwealth's motion in limine to admit officer testimony about the four interactions they witnessed before they arrested the defendant, so long as they did not refer to them as drug transactions.

When asked why he was in the area, Trooper Scott testified that he and other officers were "conducting surveillance" and that they "were watching the defendant, Mr. Pierson, meet various individuals on the street." He further stated that he "knew Mr. Pierson from [his] investigation." Officer Marley also testified that the police were in the area "conducting some independent surveillance." When asked by the prosecutor who or what he was surveilling, Officer Marley responded, "We were in the area for a narcotics investigation involving Mr. Pierson." A short while later, Officer Marley also stated that the police were surveilling "an area that [they knew] that Mr. Pierson had been involved in narcotics[.]" In response to defense counsel's objection, the judge struck the end of that sentence and contemporaneously told the jury, "if it's stricken, you just forget you heard it." At the close of trial, the judge reminded the jury in his instructions not to "consider anything that was stricken or that I told you to disregard."

We note that several similar statements were made at trial to which defense counsel did not object. During opening argument, the prosecutor stated that the officers "were conducting surveillance of Mr. Pierson, the defendant before you today." During closing argument, the prosecutor reminded the jury that the officers were conducting surveillance and stated that a car pulled up to an "address where they knew Mr. Pierson was operating-that-was that day." Finally, in response to the prosecutor's question about "who or what" the officers were surveilling, Officer Gero testified that he was conducting surveillance on the defendant.

The defendant was found with roughly ten times the lethal dose of cocaine, $281 in cash, and a cellphone. Additionally, a narcotics expert testified that the type of conduct witnessed by the officers on the day of the defendant's arrest was consistent with drug sales.

Though this particular statement did not contain the word "consistent," it followed a line of questioning that repeatedly used the word "consistent." Further, following this statement, the prosecutor asked Trooper Hean, "And would that amount of drugs be consistent with possession for personal use?" to which Trooper Hean replied, "No."

The entire statement is:
"Recall when we were talking with Officer Marley and Trooper Gero. They were very honest with you. 'You know what, I was looking in my mirrors, I was looking over my shoulder, I was looking up over the rear seat, I couldn't see everything. What I saw I relayed.' And you heard that. Some things Officer Marley saw, Trooper Gero didn't. Some things the other way around. But they were perfectly honest with you, saying, 'You know what, I didn't see everything.' "